[Crim. No. 315. Fifth Dist. Mar. 2, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. NICK LOPEZ, Defendant and Appellant.

Nick Lopez, in pro. per., and Bernard G. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Raymond M. Momboisse and Richard L. Hamilton, Deputy Attorneys General, for Plaintiff and Respondent.

CONLEY, P. J.—The defendant, Nick Lopez, was convicted of burglary. He conceded that he entered the home occupied by Rosalie Burres and her husband at 632 Santa Ana Street in Sacramento during the nighttime and without their leave. The only question that remains with respect to the commission of

the alleged crime is whether or not the defendant had the intent to commit theft at the time he entered the dwelling house. The jury, of course, believed under proper instructions that the defendant did have such an intent, and it is our duty to examine the record to see whether or not there was substantial evidence to that effect. On appeal, the defendant contends that there was a failure to prove criminal intent, and he also maintains that there were various errors at his trial which prevented him from having a fair hearing; consequently, he argues the judgment of conviction should be reversed for both major reasons. It should be noted that on arraignment the defendant admitted one previous felony conviction, also, that the trial court denied a motion for a new trial.

We shall first examine the question whether the jury had substantial evidence upon which to base its verdict of guilty. The evidence adduced by the prosecution included the Burres family experiences on the night of the alleged crime. On Friday, the 6th of August, 1965, Mr. and Mrs. Burres went out for dinner after he returned from his work; when they got back to their home they watched television in their living room. Mr. Burres went to sleep while lying on the couch. At about 10:30, Mrs. Burres tried to awaken him; he opened his eyes and said he would be going to bed in a short time but then went back to sleep. Mrs. Burres turned off the television and the lights in the living room, locked the wooden front door, shut the door from the kitchen to the carport, without locking it, and then went into their bedroom to prepare for bed. Mrs. Burres testified that there were no lights on in the kitchen or the living room or in the second bedroom where their child was sleeping. As she planned to read for awhile, she left the overhead light on in her own bedroom; the light switch was located inside the door between the bedroom and the living room. On either side of the bed as it was then placed was a window; these two windows were both shut and locked when she went to bed and the screens, which were on the room side of the windows, were both in place and firmly attached by wing nuts. She fell asleep while reading in bed but awoke sometime after midnight when she was aware of a man in the room and thought her husband was coming to bed. She spoke her husband's name, opened her eyes, and saw a man standing over her, who proved to be the defendant. Agitated, she called him a "dirty name" and gave him a judo chop in the face. Mrs. Burres jumped up and called her husband's name, and the strange man ran out of the bedroom; he

had on a white T-shirt and wore a straw hat of peculiar shape; Mrs. Burres said the light in her room had been turned off, and the moon was shining in the window. The defendant did not say anything that was understandable when he was in the bedroom, but he emitted a groaning sound while he was near the bed. It should be added that there is no claim that he even touched Mrs. Burres. The husband woke up when the defendant was making his hurried exit through the living room and out of the front door; the husband, barefooted, followed him into the street, but was unable to catch him.

It should be noted that one of the screens had been taken from the bedroom window and the window opened. In view of the fact that the windows, according to Mrs. Burres, had both been closed and the screens firmly attached by wing nuts, the inference is inescapable that the defendant was the one who opened the window and took the screen away for the purpose of furnishing an alternative escape route. A similar inference would arise that he unlocked the wooden front door after he had entered the home and before he was discovered. While nothing had been taken from the house, certain objects of personal property which had been on the window ledge had been taken from that position and placed on a dresser. On the following day, Mrs. Burres identified the defendant at a police lineup, and the defendant, on the stand, admitted that he had entered the house.

The defense proved that Mr. Lopez had been drinking during the early part of that evening, principally at a place called the Sky Room in Del Paso Heights. Although he had never been in the Sky Room before, he met a number of people there that night, mostly habitues. The testimony shows that between 11 o'clock and 11:30, he left to pick up more liquor and that he did in fact buy two bottles of whiskey on Del Paso Boulevard, and was bringing it back in his car toward the Sky Room when he was stopped by police officers on patrol around midnight. They asked him what his name was and what he was doing and noted that there was a light out at the rear of his car and that the automobile had been weaving in its course; they asked him if he had been drinking and he admitted it and told them that he had liquor in the car. While he testified that they said, ''Well, you can't be driving this car because you are too drunk,'' one of the officers stated on the stand that they gave him a run-of-the-mill sobriety test, which he passed safely and they concluded that, while he had been drinking, he was not drunk or subject to arrest. During

their discussion, the motor in the car continued to run and it finally gave out of gas. The officers helped him push the car to a reasonably safe place around the corner and told him that they would take him to his brother-in-law's house, which was relatively near and where he could get someone to bring him back with gasoline to pick up his car. The officers started toward Willard and Santa Ana Avenues but, after going only part way, they stopped and told him that they could not take him any further, because they had received news of a shooting which they had to investigate immediately.

While defendant was walking toward his brother-in-law's house, he came to the home of one Christina Medina, a young woman with children, whom defendant had met previously and to whom he had attempted to pay attention. When Christina was on the stand she said she had repulsed him on more than one occasion, because he was married. The defendant went up to the door intending, as he said, to invite Christina to go to the Sky Room with him. Her house was dark, but he thought she might be watching the television; receiving no reply he started up the street. When he got to the Burres house, next door, he testified that he saw lights on in the house and that the front door was open; he imagined that Christina might be there. He said that he walked up to the door and knocked, waited a few seconds but did not see anybody, kept knocking, and then entered the open front door. When he saw no one in the living room, he went into Mrs. Burres' bedroom; he thought the light was not on in that room, because he could not see clearly. He did see someone lying on the bed, but did not know whether it was a man or woman. He found out when the woman screamed, and he ran. He said he was intoxicated, and testified that he did not remember Mrs. Burres hitting him, but that he had sustained a bruise on his mouth on the previous night when he was struck by one of a group of Canadian sailors to whose ship he had taken them at the Port of Sacramento; he further stated that he was hit then for no reason, and that the guards at the port gate called the Sheriff of Yolo County.

Lopez testified that he ran out of the Burreses' front door, and that he saw no one in the house besides Mrs. Burres. He said he had no intention of doing anything wrong. He finally got to his brother-in-law's house, where a friend of the brother-in-law took him to buy some gas and to pick up his car. When he got to the vehicle, he opened the trunk and gave the man who had taken him there a drink from one of the bottles.

He got the car started and returned to the Sky Room, staying there until it closed, and then going home.

It is easy to conclude, from a review of the reporter's transcript, that the jury had ample reason based on the evidence of the prosecution to find that the defendant intended to commit theft when he entered the dwelling house. ■ A specific intent to commit theft or some felony is an essential ingredient of burglary, and such intent must be proved as a fact. (*People* v. *Gibson,* 107 Cal.App. 76 [289 P. 937]; *People* v. *Kittrelle,* 102 Cal.App.2d 149 [227 P.2d 38].) However, the necessary intent is very seldom susceptible of direct proof (*People* v. *Smith,* 84 Cal.App.2d 509 [190 P.2d 941]), and its existence may, of course, be proven by inference. (9 Cal.Jur. 2d, Burglary, § 37, pp. 492-495.)

■ Under Mrs. Burres' testimony, the defendant could not have entered the house by the front door as it had been locked by her. The carport door was not locked, and it is a legitimate inference that it was used by the defendant to enter the house. Mrs. Burres testified that the light was on in her bedroom where she had been reading before she fell asleep, and that the windows were both closed and locked because her husband was troubled with asthma and could not easily withstand the night air in the vicinity of their home; she also said that screens which were inside the windows were firmly in place. Unquestionably then, the jury could find that the light in the bedroom was turned off by the defendant and the screen taken down and one window opened, accompanied by the moving of certain articles from a window ledge to a nearby dresser; the latter fact might be considered to be an interrupted asportation. Furthermore, the defendant ran away with all possible speed when she woke up, which showed a consciousness of an offense of some kind.

Our conclusion is that there was ample evidence before the jury from which it could properly find the existence of an intent to commit theft at the time that Lopez entered the dwelling house.

■ There are left for consideration the varying claims of unfairness. As properly contended by appellant, the right to the assistance of an attorney is fundamental to a fair criminal trial. (*Gideon* v. *Wainwright,* 372 U.S. 335 [9 L.Ed. 2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733].) And *People* v. *Ibarra,* 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487], made it clear that a defendant must be so aided that the trial does not become a mere "farce or a sham." Originally, the

public defender's office was appointed by the court as counsel for the defendant, but he later made private arrangements for representation by Cullen A. Stinnett, a lawyer who had been admitted to the California Bar, and who had practiced for approximately a year and a half. The appellant states that he is not complaining of "trial tactics" or the "quality of service" of his counsel, but instead he is charging what he calls obvious inadequacies and lack of knowledge of the law by his counsel throughout the trial; he says that as stated in the *Ibarra* case, *supra*, page 465, his attorney " 'failed to prepare, and that the appellant's defense was withheld not through deliberate though faulty judgment, but in default of knowledge that reasonable inquiry would have produced, and hence in default of any judgment at all . . .'."

The defendant cites several specific instances to support his contention that he did not receive proper representation during the trial; they will be discussed in sequence.

1) Mr. Stinnett stated in argument that he did not call as a witness the second officer who observed the defendant's sobriety, or lack thereof, on the night of the offense on the ground that it would cost $25 to call him. When the court stated that defense counsel could subpoena any witness he wanted in the jurisdiction in a criminal case without paying $25, counsel answered:

"I am sorry, I was mistaken. This is my first criminal case. I had run up against that in civil cases." Unfortunately, it has become the experience of many trial lawyers that law enforcement officers, generally, in civil cases demand an expert witness fee for testimony as to what they observed in the course of their official duty. It is understandable that Mr. Stinnett had met such a situation in civil cases and that his statement was made in good faith and was entirely consonant with his experience;

2) Mr. Stinnett, in one of his addresses to the jury, stated that he would like to talk about the "justification of the criminal proceedings" and that there were "three theories which can be considered in criminal punishment." Thereupon, the deputy district attorney objected and said that it was improper to talk about "punishment." The court said: "That is true, counsel. Punishment is not a matter for this jury to consider or any consequences that flow from a conviction. I am sure the jury will understand." It seems to us that the court and the prosecution on the one hand and the defendant's counsel on the other hand may have been talking about

two different things. It is normal and proper procedure to instruct jurors that they should not be affected in any way by the question of punishment, and that, under the law, punishment is to be considered by the court, or other representatives of the state, and not by the jury. On the other hand, it seems to us that it may be unduly restrictive of a lawyer's argument in a case to prevent him from discussing abstractly the theory of the criminal law. Furthermore, it should be observed that the record does not show what counsel was going to say, and we cannot hold that there was anything improper in what conceivably might have been argued by the attorney for the defendant;

3) When Mr. Stinnett had the defendant on the stand, he asked him on direct examination if he had ever been convicted of a felony, but the judge would not permit the defense counsel to bring out the prior felony conviction, saying that such proof constituted impeachment and that the prosecuting attorney was the only proper person to impeach the witness. However, experience demonstrates the common tactic of criminal defense lawyers to establish this very fact when they have their client on the stand. The objective is perfectly clear, namely, to take the sting away from what would normally eventuate on cross-examination by the state. In view of the fact that proof by the state of the past felony convictions of a defendant-witness is admissible, we hesitate to hold that his own counsel cannot properly ask a question of this kind;

4) During examination of the defendant, his counsel sought to emphasize his version of events on the night of the alleged crime by asking, ''Do you realize that this is in direct contradiction?'' [of the prosecution's account of happenings]. The trial court told the defendant's counsel that he could not question the witness in that manner. We would again respectfully differ from the viewpoint of the trial court believing that ample leeway should be granted to defense counsel to emphasize part of his case in this manner if it appears to be appropriate and fitting to him.

A careful examination of the record and a consideration of the amplitude allowed a lawyer in conducting the defense of his client, lead to the conclusion that some, at least, of the restrictive measures imposed by the trial judge would not be universally enforced; and that in any event there is no showing that the defense was in any sense ''a farce or a sham.''

Appellant also contends that his attorney should have subpoenaed a witness to testify regarding an assault on him by a

Canadian sailor on the night before the alleged crime to confirm that the cut on his lip had actually been there before the Friday night in question, thus refuting the charge of the prosecution that Mrs. Burres had created the condition of the defendant's mouth by hitting him with a judo chop in her bedroom. Defense counsel, at the proceedings on motion for a new trial, stated that he could have brought in the police officer from the port authority to show that defendant had been in a fight, but that it was his judgment to keep the officer away from the stand, because it might have resulted in prejudice against the defendant. The trial judge stated at that time, "I think that was good judgment."

The appellant also argues that his attorney should have tried to impeach Mrs. Burres through the use of a police report allegedly dated August 7, 1965, and made by the Detective Division of the Sacramento City Police Department, wherein it was stated that Mrs. Burres then gave information to the effect that the suspect had entered the house through the unlocked front door. It would seem that defense counsel might well have pursued any intimation that Mrs. Burres had previously stated that the front door was unlocked, because evidence supporting the testimony of defendant that he walked into the house through the open front door would be important to confirm his version that he was drunk and had no intention of taking anything from the house. It should be noted, incidentally, that it is not claimed that Mrs. Burres signed any statement, but that the report is one made by the police officers and subject to honest mistake. However, this report is not in the record and there is nothing that this court can do about it at this time.

■ Defendant next contends that the arresting officers failed to inform him of his constitutional right to remain silent and to be represented by counsel. The evidence shows that two Sacramento officers went to the home of the defendant on the morning after the alleged crime and took him to the police station for possible identification by Mrs. Burres. A police officer testified at the trial that he arrested the defendant at his home and advised him that he had the right to remain silent and the right to have an attorney during every stage of the proceedings. While the defendant and his wife testified to the contrary, it was a matter for the jury to determine from the conflicting evidence. ■ Furthermore, the legality of the arrest was not attacked prior to or at the time of the trial, and it cannot be properly questioned now for the

first time. It should be observed that the defendant did not deny during the trial, or at all, that he had entered the house of the Burres family without permission.

■ Appellant also claims that prejudicial comments were made by the prosecuting attorney in the presence of the jury. For example, on cross-examination of defendant the deputy district attorney asked, ''After going through the side door, did you go and unlock that front door?'' And he also asked, ''You went in to steal and you were distracted, because you saw an attractive woman. Isn't that what happened?'' Defendant urges that there was no basis for these remarks, and that they were prejudicially erroneous, because it is misconduct for the prosecutor to imply facts not in evidence. (*People* v. *Sloan*, 223 Cal.App.2d 96 [35 Cal.Rptr. 519].) However, the prosecution's testimony had already established by inference that entry was made by defendant through the carport door.

The first question complained of by defendant was a repeated question; it was asked three times, and the court finally said: ''He said he did not go through the side door, counsel.'' As to the second question, there was an objection by Mr. Stinnett which was sustained by the court; this questioning by the prosecution was thus curbed by the court; it does not appear reasonably probable that without the questioned conduct of the prosecution a result more favorable to appellant would have been reached. (*People* v. *Sloan, supra,* p. 100.) There is no prejudicial error in this respect.

■ Defendant urges that it was improper for the court to refuse to give an instruction that the jury might convict of a lesser included offense. While there are no copies of instructions in the transcripts, the proceedings on motion for a new trial indicate that a request was made by the defense for an instruction of this kind. However, such an instruction was not given because the court held correctly that there is no such included offense on a charge of burglary. In the argument on motion for a new trial, defense counsel contended that Penal Code, section 602, subdivisions (j) and (*l*), were applicable; the court, however, stated that at the time of giving instructions, only section 647, subdivision (g), of the Penal Code was referred to, and that such an instruction was refused as not a necessarily included offense.

Penal Code, section 647, has to do with disorderly conduct, and subdivision (g) states that any person: ''Who loiters, prowls or wanders upon the private property of another, in

the nighttime, without visible or lawful business with the owner or occupant thereof; or who, while loitering, prowling or wandering upon the private property of another, in the nighttime, peeks in the door or window of any inhabited building or structure located thereon, without visible or lawful business with the owner or occupant thereof. . . ." is guilty of disorderly conduct, a misdemeanor. Obviously, the whole section is not intended to protect the property and safety of householders; it is designed to control "peeping Toms" and other persons of that type.

The trial judge said as to the application of section 602, subdivisions (j) and (l), of the Penal Code that he knew of no authority holding that either of the two subsections could be included offenses in the crime of burglary. The court properly said that if the jury had felt that defendant did not have the intent to commit theft at the time he entered the home, it should have found the appellant not guilty.

Section 602, subdivisions (j) and (l), of the Penal Code enumerate trespasses which constitute misdemeanors, if the facts are proven, as follows: " (j) Entering any lands, whether unenclosed or enclosed by fence, for the purpose of injuring any property or property rights or with the intention of interfering with, obstructing, or injuring any lawful business or occupation carried on by the owner of such land, his agent or by the person in lawful possession;"

" (l) Entering and occupying real property or structures of any kind without the consent of the owner, his agent, or the person in lawful possession thereof;" It seems clear that these subsections are not intended to refer to, or cover, the wrongful and criminal action constituting burglary.

A necessarily included offense is that which occurs when an offense cannot be committed without *necessarily* committing another offense. (*People* v. *Greer,* 30 Cal.2d 589 [184 P.2d 512].) Section 602, subdivision (j), is not a lesser included offense, as different intents are required. (*People* v. *Harris,* 191 Cal.App.2d 754, 758-759 [12 Cal.Rptr. 916].) Subdivision (l), requires entering and "occupying" property.

 Defense counsel moved, pursuant to Penal Code, section 17, that the court declare the offense committed by defendant to be a misdemeanor, and that he be sentenced to the county jail rather than the state prison. The prosecution correctly stated that burglary is an absolute felony offense for which there is no alternative punishment provided and that

punishment for burglary of the first degree is five years to life; the defense motion was improper.

Defendant urges that the judgment and sentence constitute "cruel and unusual punishment" in that they are not commensurate with the facts of the case. The punishment is not excessive for the offense charged and proven—burglary of the first degree.

We find nothing in the record that would justify a reversal. The judgment is affirmed.

Gargano, J., concurred.

A petition for a rehearing was denied March 28, 1967. Stone, J., did not participate therein. Appellant's petition for a hearing by the Supreme Court was denied April 26, 1967. Peters, J., was of the opinion that the petition should be granted.