Filed 4/22/14  P. v. Baldwin CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B245434 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA400585) |
| v. | |
| WILLIAM HENRY BALDWIN, JR., et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County. Jose I. Sandoval, Judge.  Affirmed in part, reversed in part and remanded with directions.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant William Henry Baldwin, Jr.

Jonathan B. Steiner, Ann Krausz, California Appellate Project, under appointment by the Court of Appeal, for Defendant and Appellant Justin Ritter.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Tasha G. Timbadia, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted William Baldwin and Justin Ritter of first degree residential burglary in violation of Penal Code section 459.[1]  Baldwin admitted having suffered four prior prison sentences within the meaning of section 667.5, subdivision (b).

The trial court sentenced Ritter to the low term of two years in state prison.  In Baldwin's case, the trial court imposed the low term of two years and an additional four years for the prior prison term enhancements, for a total sentence of six years.

Baldwin and Ritter both appeal on the ground the trial court abused its discretion in denying their respective motions to continue the trial in order to seek *Pitchess*[2] discovery.  Baldwin also appeals on the grounds that:  (1)  the trial court violated his constitutional right to counsel when it failed to conduct a second *Marsden*[3] hearing and denied his request for a trial continuance to retain counsel of his choosing; and (2) evidence of his intent to commit a burglary was legally insufficient to support his conviction and requires reversal of the judgment.

FACTS

**Prosecution Evidence**

Beverly Rowe is the conservator for Jeanette DuBose who owns a home in Los Angeles in an area of expensive homes.  In July 2012, someone broke into DuBose's home, which contained her collection of 70 to 80 pieces of African art.  In the 1970's, the collection had been valued at approximately $65,000 and had been housed in a museum.

At the time of the break-in, DuBose's home was not in a livable condition due to her hoarding, her refusal of help, and the fact she was blind.  Rowe had temporarily moved DuBose to Rowe's home.  Rowe was in the process of having DuBose's home repaired so that DuBose could live there with 24-hour care.  There was a large dumpster

---

[1]     All further references to statutes are to the Penal Code unless stated otherwise.

[2]     *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

[3]     *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

in front of the home, the lawn was dead, and some of the windows were boarded up. In July 2012, Rowe was at the home every day while workers performed their duties.

Manuel Ortega, a police officer in the Los Angeles Police Department (LAPD), was working in his off-duty hours as a security guard for Seagraves, Shaw, and Associates (SSA). DuBose's neighbor across the street, Joane Henneberger, was an SSA client. Ortega responded to a call from Henneberger at approximately 7:17 a.m. regarding intruders in DuBose's home. Ortega wore his SSA uniform and arrived in a company vehicle.

Henneberger pointed out DuBose's house to Ortega, and he waited outside the house for the LAPD to arrive. Ortega heard noise from the upstairs and walked to the rear of the home. At the sound of approaching sirens, Ortega heard people running downstairs. At trial, Ortega identified Baldwin and Ritter as the two individuals he saw at the scene. He saw one of the defendants come out of a French window followed shortly thereafter by the other defendant. Ortega testified that he saw one statue being carried out and another one that appeared to be floating horizontally out the window, since he could not see who was holding it. Knowing he had "proper backup" at that point, Ortega yelled to the individuals to stop and put their hands where he could see them. One defendant, later identified as Baldwin, looked toward Ortega and turned back into the house, pushing the other defendant inside as he did so.

Ortega told the intruders to come out or he would send a dog in after them. They came out with their hands up and were subsequently handcuffed and removed from the scene. Upon entering, Ortega saw some statues next to the French window. LAPD officers searched the house and found no other suspects.

Henneberger testified that she became concerned when she saw a white car outside that Sunday morning. The car had no rear license plate and was unfamiliar to her. It drove rapidly away. Moments later, she saw two men scurrying toward the victim's home and then back to the rear of the home. Henneberger knew DuBose and knew the two White males were not DuBose's friends. She called the security company and then 911. She saw Ortega approach the rear of the house with his gun drawn and yell for the

3

intruders to put their hands in the air. She became nervous and called 911 again. Both 911 calls were played for the jury. Henneberger had noticed the two individuals in front of the house the afternoon before, "just lingering around."

**Defense Evidence**

Ritter testified on his own behalf. He admitted having been convicted of felonies in 2001, 2003, and 2004. In July 2012, he was homeless for three or four days. He and Baldwin were together, and they encountered two old friends named Tom and "Joe." Ritter did not know their last names. The other two men told Baldwin and Ritter about an abandoned house where they could "kick it" for the day. The men said they had been squatting in the house. Because he was coming down from a methamphetamine high and his hernia was hurting him, Ritter decided to go to the house with Baldwin and the other two men. They all walked there. Baldwin was also "high."

Ritter believed the house looked condemned. The four of them walked to the back yard and saw that a window was open. Inside they saw nothing but rubbish. Tom said there was a flat spot where Ritter could lie down, so they all climbed in the window. The place smelled like rats. Baldwin sat down and Ritter passed out on the steps. "Jeff" was there also. Ritter woke up to a voice saying, "Come out. . . . It's the police." Ritter followed Baldwin out the window, where he saw three policemen and a security guard. Neither Ritter nor Baldwin had anything in their hands when they left the house. Ritter never touched a statue, and he did not enter the house to steal anything—only to sleep. Ritter had no idea where Jeff and Tom went. Ritter denied being in front of the house the day before.

## DISCUSSION

### I. Denial of Continuance to File *Pitchess* Motions (Baldwin and Ritter)

#### A. *Defendants' Arguments*

Defendants contend the trial court abused its discretion as a matter of law by denying the request for a continuance and ruling that discovery of Ortega's police personnel records was not available under the *Pitchess* procedure. The ruling was contrary to existing precedent and an erroneous application of the law. Since good cause

4

was shown in this case, the records were discoverable under the relevant Evidence Code and Penal Code sections. Defendants argue that the trial court's erroneous ruling deprived them of their state and federal constitutional rights to due process, the effective assistance of counsel, and a fair trial. The error requires reversal of the judgment and remand to permit the defense to complete *Pitchess* discovery.

### B. *Proceedings Below*

Trial began on November 6, 2012, and voir dire commenced. On the fourth day, as voir dire continued, counsel for Ritter stated he had learned that morning that Ortega was a police officer. He requested a continuance to file a *Pitchess* motion because his client had told him the information Ortega relayed was not true. Baldwin's attorney stated he had learned the day before that Ortega might be a police officer and had alerted the court. Ortega's LAPD employment had just been confirmed 10 minutes earlier, and he joined in the request for a continuance. The trial court asked counsel if they had any authority on the issue of whether a person who happens to be a police officer, but was working as a private citizen, was subject to a *Pitchess* motion. Baldwin's attorney said he had no authority. The trial court stated it had not found any authority on the subject in its research the day before. The court denied the request for a continuance.

Trial continued, and after Ortega testified, Baldwin's counsel told the court at side bar that they needed to file a *Pitchess* motion. He said Ortega's testimony made it clear he was not acting solely as a security guard because he was in charge of the backup officers who recognized him as an officer. The court said that counsel had had an opportunity to talk to Ortega earlier. Counsel replied, "No." The court said Ortega was identified in the police report. Counsel replied that he first knew Ortega was LAPD two days ago and said LAPD "will not speak to us." The court stated, "As I ruled before in my ruling, he is not operating as a police officer. He is operating as a security guard independent of his work as an LAPD officer." The trial court then asked counsel when he had received discovery in the case and if he had had an opportunity to talk to Ortega. Counsel replied that "the report" was very brief and led him to believe there was not much he needed to ask about it. He therefore subpoenaed the SSA employment records

5

to see if they contained any impeachment information on Ortega. The court again stated that Ortega was operating as a security officer, that the court had been unable to find any cases on the subject, and that counsel had not directed it to any. The court again denied the continuance.

### C. Relevant Authority

In *Pitchess*, the California Supreme Court held that a criminal defendant has a limited right to discovery of peace officer personnel records "based on the fundamental proposition that he is entitled to a fair trial and an intelligent defense in light of all relevant and reasonably accessible information." (*Pitchess*, *supra*, 11 Cal.3d at p. 535.) "The requisite showing [to compel discovery] may be satisfied by general allegations which establish some cause for discovery other than 'a mere desire for the benefit of all information which has been obtained by the People in their investigation of the crime.' [Citations.]" (*Id*. at p. 537.) In 1978, the Legislature "'codified the privileges and procedures surrounding what had come to be known as "*Pitchess* motions"'" by enacting Penal Code sections 832.7 and 832.8 and Evidence Code sections 1043 through 1045. [Citations.]" (*City of San Jose v. Superior Court* (1998) 67 Cal.App.4th 1135, 1142.)

Evidence Code section 1043 requires the moving party to submit a written motion containing a description of the type of records being requested. The motion must be supported by affidavits showing good cause for the discovery sought, "setting forth the materiality thereof to the subject matter involved in the pending litigation and stating upon reasonable belief that such governmental agency identified has the records or information from the records." (Evid. Code, § 1043, subd. (b)(3).) The moving party must provide notice to the governmental agency in possession of the records. (Evid. Code, § 1043, subd. (c).) The "statutory scheme 'carefully balances two directly conflicting interests: the peace officer's just claim to confidentiality, and the criminal defendant's equally compelling interest in all information pertinent to his [or her] defense.'" (*City of San Jose v. Superior Court*, *supra*, 67 Cal.App.4th at p. 1144.)

"Penal Code section 1050 provides: '"Continuances shall be granted only upon a showing of good cause."' [Citation.] 'The grant or denial of a motion for a continuance

6

rests within the sound discretion of the trial judge [citations]. The trial court's decision whether or not to grant a continuance will not be disturbed on appeal in the absence of a clear abuse of discretion. [Citations.] Discretion is abused only when the court exceeds the bounds of reason, all circumstances being considered. [Citations.]' 'In deciding whether the denial of a continuance was so arbitrary as to violate due process, the reviewing court looks to the circumstances of each case, "'particularly in the reasons presented to the trial judge at the time the request [was] denied.'" [Citations.]' [Citations.]" (*People v. Froehlig* (1991) 1 Cal.App.4th 260, 265.)

### D. *Remand Required*

In the instant case, since Ortega was in fact a currently employed, off-duty police officer, his records were discoverable by Baldwin and Ritter. The case of *People v. Superior Court (McKunes)* (1976) 62 Cal.App.3d 853 (*McKunes*) is on point. In that case, the People petitioned the appellate court to set aside an order granting the defendant's discovery motion for the personnel file of an off-duty police officer. (*Id.* at p. 855.) The officer and the defendant had engaged in a confrontation in a restaurant parking lot, after which the defendant was charged with assault with a deadly weapon. (*Ibid.*) The defendant claimed to have acted in self-defense and requested disclosure of citizen complaints against the officer for alleged acts of "'unwarranted aggressive behavior, violence, or excessive force.'" (*Id.* at pp. 855, 857) The People contended the information was not discoverable because the officer was not acting in his official capacity at the time of the incident. (*Id.* at p. 856.)

In denying the writ, *McKunes* held that to justify a different rule of discovery based upon whether the officer was off duty or on duty, the court would be obliged "to hold that, as a matter of law, complaints in an officer's personnel file are not material to charges of off-duty aggression." (*McKunes*, *supra*, 62 Cal.App.3d at p. 857.) The court rejected the argument that the file of an off-duty officer is as private as the file of any other private citizen and is therefore not discoverable. (*Ibid.*) The court pointed out that even a private employer would be required to respond to a subpoena duces tecum for personnel records of an employee if a strong showing of need were made in a criminal

7

case. (*Id*. at pp. 857-858.) A public employer must respond to such a subpoena in the absence of governmental privilege. (*Id*. at p. 858.)

Similarly, in *Davis v. City of Sacramento* (1994) 24 Cal.App.4th 393 (*Davis*), the court held that the discovery rules contained in Evidence Code sections 1040 through 1047 applied equally to the records of active and retired police officers, although it denied discovery of the personnel records of a retired police officer who testified merely as an expert witness. (*Davis*, at pp. 399, 400.) The court stated, "Because personnel records of a particular officer are presumably generated while the officer is employed by the police department, they are '[r]ecords of peace officers.' They do not cease being such after the officer's retirement. If the Legislature had intended anything different, it could easily have so provided." (*Id*. at p. 400, quoting Evidence Code section 1047; accord, *Abatti v. Superior Court* (2003) 112 Cal.App.4th 39, 57; *People v. Superior Court (Gremminger)* (1997) 58 Cal.App.4th 397, 404-407.) The reasoning of *Davis*, *Abbatti*, *and Gremminger* clearly indicate that, as with former police officers, the records of off-duty police officers do not cease being records of a peace officer merely because the officer is off duty.

Respondent briefly acknowledges that existing precedent allows discovery of personnel files for police officers working in an unofficial capacity but argues that defense counsel failed to file motions supported by declarations to establish good cause to warrant an in-camera review and failed to comply with the notice provisions. Respondent asserts that at the time of the defense requests for a continuance, it offered no explanation as to why a *Pitchess* motion could not have been timely brought. Also, counsel never provided the court with the requested precedent to support the applicability of *Pitchess* to Ortega.

The question of lack of diligence on the part of defense counsel depends on when they became aware, or should have become aware, of Ortega's employment as an LAPD officer. There was no indication of his status in the preconviction probation reports nor in the evidence presented at the subsequent preliminary hearing. The testimony in that hearing was given by another LAPD officer, Brent Hopkins, who investigated the

8

burglary. Officer Hopkins never referred to Ortega as a police officer. He referred to him as "Mr. Ortega" and identified him by saying, "Mr. Ortega is employed as a private security guard by Ms. Henneberger." The police report is not part of the record.

Baldwin's counsel subpoenaed Ortega's SSA employment records, which indicates he would have done the same with Ortega's police personnel records by means of a *Pitchess* motion had he known of Ortega's employment with the LAPD. And, although the trial court questioned defense counsel about their diligence, the record indicates that the court's principal reason for denying the continuance was its belief that Ortega's personnel records were not discoverable because he was acting in his capacity as a security guard.

On the record before us, we cannot conclude there was a lack of diligence on the part of defense counsel. Furthermore, given the trial court's ruling (and contrary to respondent's suggestion), we cannot conclude that counsel were remiss in not preparing and filing *Pitchess* motions in any event and attempting to show good cause for not complying with the notice provisions, as provided for in Evidence Code section 1043, subdivision (c). It is well established that trial counsel is not required to make futile motions or engage in idle acts. (*People v. Reynolds* (2010) 181 Cal.App.4th 1402, 1409.) And, even though counsel failed to provide the trial court with authority in support of their position, "when a trial court's decision rests on an error of law, that decision is an abuse of discretion." (*People v. Superior Court (Humberto S.)* (2008) 43 Cal.4th 737, 746; *People v. Neely* (1999) 70 Cal.App.4th 767, 776.)

Given our determination that the record must be relied upon to show that Ortega's LAPD employment was not known to counsel until the middle of voir dire, at which point there was no time to comply with the *Pitchess* requirements of notice and the establishment of good cause and materiality, we must conclude the trial court abused its discretion in not granting a continuance to allow defendants to prepare and file *Pitchess* motions. Therefore, the matter must be remanded to correct the error. Upon remand and filing of the motions, if defendants show good cause for discovery, the proper procedure

9

is that set forth in *People v. Gaines* (2009) 46 Cal.4th 172, 180-183, and summarized in our disposition, *infra*.

## II. Denial of Second *Marsden* Hearing and Continuance to Retain Counsel (Baldwin)

### A. Baldwin's Argument

Baldwin argues that, by failing to conduct a further *Marsden* hearing and then denying his request for even a 30-day continuance to retain counsel, the trial court abused its discretion and violated his constitutional rights. The trial court effectively forced him to proceed to trial without the assistance of counsel of his choice.

### B. Relevant Authority

"The right to the effective assistance of counsel 'encompasses the right to retain counsel of one's own choosing. [Citations.]' [Citation.] Underlying this right is the premise that 'chosen representation is the preferred representation. Defendant's confidence in his lawyer is vital to his defense. His right to decide for himself who best can conduct the case must be respected wherever feasible.' [Citation.]" (*People v. Courts* (1985) 37 Cal.3d 784, 789.)

"[T]he right of a defendant to appear and defend with retained counsel of his own choice is not absolute." (*People v. Blake* (1980) 105 Cal.App.3d 619, 624.) "'[I]t must be carefully weighed against other values of substantial importance, such as that seeking to ensure orderly and expeditious judicial administration, with a view toward an accommodation reasonable under the facts of the particular case.' [Citation.]" (*Ibid.*) Furthermore, "a defendant who desires to retain his own counsel is required to act with diligence and may not demand a continuance if he is unjustifiably dilatory or if he arbitrarily desires to substitute counsel at the time of the trial." (*Id.* at pp. 619, 623-624.)

"It is likewise settled that it is within the sound discretion of the trial court to determine whether a defendant shall be granted a continuance to obtain a private counsel [citation]; that there is no mechanical test for deciding whether a denial of a continuance is so arbitrary as to violate due process but rather each case must be decided on its own facts [citations]; that the burden is on the defendant to establish an abuse of discretion;

and that in the absence of showing an abuse, the reviewing court will not disturb the ruling of the trial court. [Citation.]" (*People v. Blake*, *supra*, 105 Cal.App.3d at p. 624.)

### C. *Proceedings Below*

On the first day of trial, the trial court discussed with Baldwin the People's latest offer. The court told Baldwin that, if he wished to go to trial, the jurors would be coming in shortly and trial would begin. Baldwin asked if he could "bring an issue" he had with his lawyer. Addressing Baldwin's attorney, Mr. Waldinger, the court said, "I don't know what's coming, Mr. Waldinger, you tell me." Defendant interjected, "It's not a *Marsden*." The court held a *Marsden* hearing in an abundance of caution. Baldwin complained that he had always been adamant in claiming his speedy trial rights and had never authorized his attorney to waive time, which his attorney denied. The trial court told Baldwin it was an issue for appeal, and the hearing was concluded.

After a recess, defense counsel told the court that Baldwin had just informed him he wanted a continuance in order to hire private counsel. Baldwin had spoken with his sister during the recess, and she was trying to hire private counsel "as we speak." Baldwin told the court, "She said she would probably hire me a lawyer," adding that it was "more than likely." He explained that his mother had died in New York and left him a house. His sister said she would hire a lawyer with his "inheritance money."

The trial court replied, "Look, we are at trial. The jurors are literally standing outside. Is your lawyer going to be here today?" Baldwin said, "probably not." Mr. Waldinger informed the court that defendant had asked him to request a 90-day continuance. The trial court pointed out that Baldwin did not know who his lawyer would be, or even if any selected lawyer would be ready to take the case. Baldwin was merely saying that his sister might hire him a lawyer. The court said the request was unreasonable because they were beginning trial. The People's witnesses were ready to go, and they also had a right to proceed without delay. If the lawyer were in court at that moment, the court would grant Baldwin the opportunity to be represented by the counsel of his choice, but the court did not know if a lawyer would ever appear.

11

Baldwin then asked for a 30-day continuance. The court replied, "No. There's nobody here. Your sister might hire you a lawyer. That is so unspecific and so fraught with uncertainty that I can't really make any reasonable assessment of whether or not your request is reasonable, so I'm going to deny that." When asked to comment, the prosecutor stated he was ready to proceed and all of his witnesses were ready.

### D. *No Abuse of Discretion*

We conclude the trial court did not commit reversible error by not holding another *Marsden* hearing and by denying Baldwin's request for a continuance to substitute retained counsel. Baldwin made his request for the continuance on the day trial was scheduled to begin, just as jury selection was about to start. He presented no particular justification for his desire to change attorneys. His only complaint against his appointed attorney was his claim that he had not waived time, and the court had already addressed that issue. Not only was the proposed retained attorney not present in court to confirm that he or she would accept the representation, an attorney had not even been selected. Baldwin indicated that there would be a delay of at least 30 days caused by his sister's effort to find him an attorney. Further delays could be anticipated in order for any new attorney to prepare. Baldwin's vague request was, as the trial court stated, fraught with uncertainty. Baldwin's earlier remark that he did not wish a *Marsden* hearing clearly shows that he knew the purpose of a *Marsden* hearing, and he did not request one at any time. Coming as it did on the day trial began, his request was properly denied as untimely. (See *People v. Courts*, *supra*, 37 Cal.3d at pp. 790-791.) There was no abuse of discretion or denial of Baldwin's Sixth Amendment right to counsel.

## III. Sufficiency of the Evidence (Baldwin)

### A. *Baldwin's Argument*

Baldwin claims that the proven facts in his case are susceptible to inconsistent inferences and do not establish beyond a reasonable doubt that he possessed the requisite intent for the offense of burglary.

### B. *Relevant Authority*

When determining whether the evidence was sufficient to sustain a conviction, "our role on appeal is a limited one." (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) The test of whether evidence is sufficient to support a conviction is "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.]" (*People v. Holt* (1997) 15 Cal.4th 619, 667.) "We draw all reasonable inferences in support of the judgment." (*People v. Wader* (1993) 5 Cal.4th 610, 640.) Reversal is not warranted unless it appears "'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Burglary ordinarily requires (1) unlawful entry into a building with (2) the intent to commit theft or any felony. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1041; see also § 459.) Entry of an inhabited dwelling house with the requisite intent is burglary of the first degree. (§ 460, subd. (a).)

### C. *Evidence Sufficient*

The element of specific intent "is very seldom susceptible of direct proof [citation], and its existence may, of course, be proven by inference." (*People v. Lopez* (1967) 249 Cal.App.2d 93, 98.) Baldwin points to Ritter's testimony that he had been homeless and was coming down from a methamphetamine high, and he and Baldwin went to the house only to sleep. Baldwin also notes there was no evidence he would have known there was anything worth stealing in the home when he entered because of the state of neglect it was in. He asserts that Ortega first testified that he saw only one defendant carrying a statue and later said he saw both of them carrying statues. Baldwin asserts that the proven facts are thus susceptible to inconsistent inferences regarding intent.

It is the exclusive function of the trier of fact to assess the credibility of witnesses and draw reasonable inferences from the evidence. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 162.) The jury could reasonably have concluded that Ritter's testimony

was not credible. Ritter testified that he and Baldwin walked to the home and entered it with two other men, but Henneberger, who witnessed the entire incident, saw only two men "scurrying" into the back of the residence with their heads down. The two men appeared moments after the white car without a rear license plate sped away from outside Henneberger's home. Furthermore, Ritter first testified that he was with Tom and Joe, and then stated it was Tom and Jeff.

Moreover, Henneberger stated in her 911 call that she had seen the intruders the day before. At trial, she testified that there was frequent "dumpster diving" taking place in front of the home, but on the day before the arrests she saw what she considered unusual activity. She testified that two "middle-aged White guys," who did not look like typical dumpster divers, were looking at the DuBose home, although she could not positively identify the two defendants at trial as the men she saw. The two men did not seem to be collecting scrap metal or recyclables like other scavengers she had observed; rather, "[t]hey were just lingering around."

Ortega did appear confused at one point, but he refreshed his memory with the police report. It was only minutes after Henneberger saw the men go to the rear of DuBose's home when Ortega witnessed Baldwin exiting the house through a window with a statue and saw another statue seemingly floating out of the window. It was a very short period of time for Ritter to have fallen asleep and for Tom and "Jeff" to have disappeared without being seen by Ortega, Henneberger, or the other officers.

Furthermore, upon being challenged by Ortega, Baldwin ran back into the house, pushing Ritter inside as he did so. As the jury was instructed, a defendant's flight or attempt at flight may show an awareness of guilt. (CALCRIM No. 372.) "Burglarious intent can reasonably be inferred from an unlawful entry alone. [Citation.] Even if no crime be committed after the entry, circumstances such as flight after being hailed by an occupant of the building . . . without reasonable explanation of the entry, will warrant the conclusion by a jury that the entry was made with the intention to commit theft." (*People v. Jordan* (1962) 204 Cal.App.2d 782, 786-787; *People v. Martin* (1969) 275 Cal.App.2d 334, 339 [same].)

14

Based on our review of the entire record, we conclude there was sufficient evidence from which the jury could rationally have found beyond a reasonable doubt that Baldwin, at the time he entered DuBose's home, possessed the specific intent to commit theft or another felony.

## DISPOSITION

The judgments are conditionally reversed with directions to the superior court to allow defense counsel to file *Pitchess* motions in accordance with Evidence Code sections 1043 through 1047.  If good cause is shown, the court shall review the requested records in camera to determine what information, if any, should have been disclosed.  If the trial court's inspection uncovers no relevant information, the trial court must reinstate the judgments of conviction and sentence.  If relevant information is discovered during the in-camera review, the trial court must order disclosure, allow defendants the opportunity to demonstrate prejudice resulting from the failure to disclose the relevant information, and order a new trial if there is a reasonable probability the outcome would have been different had the information been disclosed.  If defendants cannot demonstrate any such prejudice, the original judgments of conviction and sentence, which we have otherwise affirmed, shall be reinstated.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


CHAVEZ, J.


FERNS, J.*


_____

*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15